[Civ. No. 6648.  Second Appellate District, Division Two.—October 7, 1929.]

In the Matter of the Estate and Guardianship of FRANKIE JOHNSON, a Minor.  FRANK JOHNSON, Respondent, v. ADA JOHNSON, Appellant.

Roger Marchetti for Appellant.

Ben F. Gray for Respondent.

CRAIG, J.—The appellant, Ada Johnson, is the mother of Frankie Johnson, known in theatrical circles as Frankie Darro, a minor under the age of fourteen years. It is admitted that she and the respondent Frank Johnson intermarried at Los Angeles on January 15, 1923, and that said minor was born in the city of Chicago on December 22, 1917. On or about June 30, 1928, appellant filed a suit

for divorce, alleging as grounds therefor extreme cruelty, since which time she and her husband have been living separate and apart, and said suit was pending at the time of the trial in this proceeding. On September 13, 1928, the respondent Beatrice Walton petitioned the Superior Court that she be appointed guardian of the person and estate of Frankie Johnson. It was alleged therein that for a period of more than one year prior to the birth of said minor, Frank Johnson and its mother were cohabiting, and that respondent Johnson is its putative father; that by an order issued in the divorce proceeding, Frank Johnson was restrained from visiting his wife and child, and that the latter was in the exclusive custody and under the control and care of its mother. It was further alleged that said minor was employed by the moving picture industries at a salary of $300 per week, from which earnings Ada Johnson had paid $1,000, and had agreed to pay $75 per month toward the purchase of a residence. It was averred that owing to habitual intemperance, depravity and association with improper persons, practices of immoral acts, and the use of degrading language in the immediate presence of her child, the said Ada Johnson is an unfit and improper person to have its care, custody and control; that its welfare was imperiled, and that unless the environment and personal care of said minor should be improved, a valuable contract of employment would be canceled, and its estate entirely dissipated. On October 23, 1928, respondent Frank Johnson filed a petition for his own appointment as guardian of the person and estate of said minor, alleging similar facts. In each of these petitions details of deplorable occurrences at the home are set forth which it is unnecessary to relate. Appellant interposed objections to the appointment of either of said petitioners, specifically denying the allegations of neglect and unfitness, and prayed that she be appointed guardian. Pending the hearing custody of the minor was awarded to Mrs. Walton, and payment of the minor's salary was temporarily restrained. After hearing the evidence it was adjudged and decreed that Frankie Johnson, "the above-named minor, is the legitimate child of Frank Johnson and Ada Johnson." L. D. Uhlman, a disinterested person, was appointed guardian, and letters were ordered issued accordingly, upon the furnishing of a bond. Ada Johnson appealed from all

orders and decrees, and particularly from the one last mentioned, fixing the paternity of the child.

It is first contended that the trial judge was disqualified to hear and determine the issues presented for the reason, it is said, that he exhibited a bias during the trial. It is asserted that "when the cause came on for hearing, and before any evidence in the cause had been duly introduced, or a witness in the case had been duly introduced and heard," the judge decided and announced his ruling. It is said in the briefs that he called counsel into his chambers, and in the absence of the reporter stated that he had observed the child, was interested in its welfare, and was determined that everything should be done for its benefit; that he was convinced that it had not been living in proper environment, that he even smelled liquor upon Mrs. Johnson when she was on the stand; that Frank Johnson was the father of the child, that it would be legitimated, and that counsel might be able to agree upon the amount each party should receive of its income, and that a person unknown to either party be appointed guardian. It is said that the contestant and appellant thereupon "duly, properly, timely and regularly" disqualified the judge by filing an affidavit of disqualification on or about November 2, 1928, and that no alternative remained than to call another judge because no counter-affidavit was filed. The respondent strenuously resists both the legal and the evidentiary grounds of this assertion.

It appears from the record that the affidavit assailing the attitude of the trial court in concluding from what it had observed that neither party should be entrusted with the guardianship, and that amity in behalf of the minor might be propitious, was neither verified nor filed until after evidence had been heard. Witnesses had testified on October 25th, a week previously, to facts strongly tending to support the principal allegations of both petitioners to which the appellant took exception. Mrs. Johnson had admittedly occupied the witness-stand in her own behalf as contestant and petitioner, and the remark of the court that she then bore odors of liquor is conceded. She was compelled to admit several charges which she had denied by her answer and as a witness. Following a thorough direct examination of respondent Johnson, the latter was

technically cross-examined until a recess was declared, with but slight, if any, effect other than to strengthen his cause. In fact, counsel for the contestant complained that this witness was "evasive," to which the court responded, as the record reveals, that he appeared "more voluble and anxious than evasive." Upon the theory that contestant was wasting the earnings of the minor in lavish and excessive entertainment of friends, a merchant was called to the stand. He testified that prior to the time when the respondent left home bills at his market for food ran from $20 to $30 per month, whereas thereafter they ran from $40 to $65, and that at the time the restraining order was issued Mrs. Johnson owed his market $80 or $90. Not only was the affidavit of alleged bias late, under the circumstances, but if there was bias at all it was impartial as between the parties litigant, although possibly single-minded as to the interests of the minor. We think subsequent developments, which we shall carefully review, wholly justified the denial of the motion.

■■ It was alleged by the appellant, testified by her, and is here insisted, that while still an unmarried woman and prior to her illicit companionship and domicile with the respondent, she committed acts of adultery with one Adolph Gelle, as a result of which the minor in controversy was born to her; that Frank Johnson was not its father, that she had not so considered him nor held him out to others. It is argued that the evidence proved the boy to be an illegitimate child, that appellant was a fit and proper person to have its custody and care, and hence that the Superior Court had no authority to deprive her of such statutory right. As to its parentage, the respondent testified that he had intercourse with appellant for more than ten months prior to the birth of the child, that they were employed by vaudeville circuits and traveled and cohabited together constantly as husband and wife during all of that time; that with the exception of nine or ten weeks in Chicago while absent they paid a woman to care for the boy, and that the minor had ever since been in the constant custody of himself and Ada Johnson. He swore that it had at all times been held out by both parties as their child, that his wife had always told him that he was the father of the child, and he had so believed. It is admitted that the minor

was born on December 22, 1917, that the parties thereafter came to California, lived together and were married in this state on January 15, 1923. Appellant was asked during cross-examination if she and Johnson had lived together as husband and wife for a number of years before the birth of the child, to which she nodded assent, but pressed for. an audible reply, she said "No." A contract with one theatrical enterprise by whom the boy was employed, which she admitted was read to her, was signed by Ada Johnson and approved by the respondent, reciting that the latter was its father. Another contract, dated April 7, 1923, was signed by them both, and recited that they were "the parents of a minor male child of the age of four years." A Miss Dione, an intimate friend of appellant who testified in her behalf, stated that Johnson passed as the father of the child. Respondent also testified that when appellant became angry she stated to him that she was going to swear that he was not the boy's father. It lay within the exclusive province of the trial court to believe the affirmative testimony as against appellant's denials, as it appears to have done. ■ It was admitted that the parties had at the time of the trial been married for a period of about six years, and the parentage of the child having thus been determined, it follows that the ruling legitimating the minor was not improper, although it was wholly unnecessary. (Civ. Code, sec. 215.)

■ As already observed, Beatrice Walton, appellant's sister-in-law, the respondent Frank Johnson, and appellant Ada Johnson, each filed a petition for guardianship. When the matter came to trial, counsel for appellant and for Mrs. Walton requested a dismissal of the latter's petition. A motion was also interposed for the dismissal of Frank Johnson's petition. After the trial court had read the petition, affidavits and objections, it appeared that each of the first two petitions alleged that the mother was not a fit or proper person to have the custody of the child, and prayed for appointment of the petitioning party or such other person as might be proper. Issues were thus presented which required judicial cognizance, and rulings upon these motions were reserved. This is assigned as error, but no substantial ground for the objection is advanced, nor can we conceive of any way in which the rights of the parties, or of the

minor whose welfare was of main concern, could have been prejudiced. The pleadings of all of the parties raised the question of fitness as to the opposing petitioners, and to dismiss, or in effect strike out, those which joined issue upon the question most vital to the welfare of the minor doubtless would have worked serious injustice transcending any imaginary or selfish interests of the litigating parties. There is no merit in this contention.

Upon the merits of the contest of the respective parties it appeared that the father and mother were not congenial, that they separated, and the mother had instituted divorce proceedings wherein the father was restrained from visiting her or the child. Johnson was out of town much of the time. There is evidence tending to show that the boy was allowed by the mother to run in the streets without sufficient or proper food or clothing; that she entertained drinking parties far into the night, and that her home was frequented by persons who drank intoxicating liquors and became boisterous. Upon one occasion appellant was pushed or knocked against a stove and her eye was badly cut. Respondent testified that he was called to the house, where he found a man lying on his face with a bottle of whisky in his hand, and that appellant was lying on her back, bruised and bleeding; that she was so drunk that she could hardly talk; that "Frankie was there at the time and heard the whole thing"; that spirits of ammonia and black coffee were administered to revive appellant. He testified that he was present when "they were all drunk." From the testimony of other witnesses, including the neighbors, it appeared that automobiles were parked in front of her residence until early in the morning, that neighbors complained of loud noises at night, that her home was raided by the police, and that one of her guests, an uncle, was arrested. She admitted that the police department ordered that she leave Beverly Hills, whereupon she moved to Van Nuys. At the latter residence witnesses testified that there was a great deal of noise nearly every night; that they were awakened, one of them stated, by the drinking and hollering, "give me some more, I ain't half drunk yet, and such things as that"; that more people arrived at 11 and 12 o'clock at night and "stayed towards morning," finally leaving in taxicabs. When asked if other neighbors heard

it, he replied, "They sure did, and if they were wanted on anything like that subject to let them know"; that he rang the bell and "did one or two things," but that they only "took it up on the other side of the house." There is proof that one of appellant's frequent visitors brought immoral pictures to the house, and that she personally brought home portions of obscene films which she stated she had seen made at the studio, which she joked about and showed to others. Respondent testified that she drank constantly, night and day, before he was compelled to leave home; that "It was agreed that something must be done; she had spent all of the child's money, had lost the car, and the home and everything else since I had been gone a few months." There were bottles of liquor around the house, according to all of the witnesses, including appellant, and it is apparent that these conditions flourished in the immediate presence of the minor. Appellant's brother Walton swore that he saw the pictures above mentioned, that they were all drinking wine and gin when he was present; that he "saw her feeling good, but never on the floor"; that she was drinking when Frankie, the boy, was running the streets. He further testified that his wife's petition for guardianship was filed because they "wanted to take some steps to stop her running around," "Frankie was being neglected," and that "something ought to be done." Asked if he believed his sister was a fit and proper person to have the custody of the boy, he replied, "Well, she is not at the present time."

We need not further pursue the question as to whether or not the trial court was warranted in concluding that the best interests of the minor would be subserved by the appointment of a disinterested person as guardian of its person and estate. Its education, nurture and morality were of first importance, and its income, amounting to more than a thousand dollars per month, demanded conservation. The court was justified in believing, as it apparently did, that the surroundings were demoralizing and that the boy was being neglected. It may well have foreseen that the safeguards of harmonious, peaceful, cultural and refining environments were imperative to the child's future. ■ It is not alone the rights of the parents but the welfare of the child that is presented for determination, and for that

reason a wider discretion is afforded the courts in dealing with matters pertaining to children than in many other cases. (*In re Guiterrez*, 46 Cal. App. 94 [188 Pac. 1004].) Much is said in the briefs of appellant regarding her constitutional rights, and the power of the court in such cases.

■ The courts have ever recognized the preference of parental custody of minors of tender years, but the assumption that parents have property rights in children has long since been repudiated. In *Anthony* v. *Tarpley*, 45 Cal. App. 72 [187 Pac. 779], it was argued that unless granted the relief prayed, the parents might suffer great and irreparable injury. It was held that: "The good of the child is regarded as the controlling force in directing its custody, and the courts will always look to this, rather than to the whims and caprice of the parties. (*Crater* v. *Crater*, 135 Cal. 633, 634 [67 Pac. 1049]; *Mack* v. *Mack*, 91 Or. 514, 516 [179 Pac. 557].) The child is not property, but is a citizen of the state of California, and as such is peculiarly under its guardianship and subject to its supervisory control." It is not in contemplation of the law that parents shall forever be deprived of the custody of a child. The court may adjudicate the status of the minor, however, and upon sufficient showing it becomes its duty to make proper provision for the guardianship, care, custody and control of the child. As said by our Supreme Court, "The past failure of a parent to provide for his child may well coexist with a present ability to fully discharge all the duties of guardianship." (*In re Michels*, 170 Cal. 339 [149 Pac. 587].) ■ The most that can be said for appellant's position as to this phase of the case is that the evidence was conflicting, and resolving all intendments in favor of the judgment, as we must, we cannot say as a matter of law that it was error to deny all three petitions for guardianship, and to appoint another person meeting the court's approval.

■ It is contended that the issue of legitimation was not before the court. In this regard it is sufficient to observe that Frank Johnson alleged that he was the father of said child. Mrs. Walton alleged in her petition that at the time of Frankie's birth his mother "was an unmarried woman, and that for more than a period of one year prior to the birth of said minor the said Ada Johnson was cohabit-

ing with Frank Johnson." Appellant in her answer "alleges that she is the mother of said Frankie Johnson and that the said Frank Johnson, petitioner herein, is not the father of said minor," and upon the theory that the minor was illegitimate, she insisted that she was exclusively entitled to its custody. It became necessary upon this issue so joined that the status of the child be determined, and the court found from the evidence that the minor was not illegitimate for the reason that Frankie Johnson was the son of the respondent and the appellant, and that the parties had intermarried. The question was sufficiently pleaded for the purposes of this proceeding. In this connection appellant attempts to capitalize the fact that in the divorce proceeding both parties alleged that there was no issue of their marriage. Technically true as that may have been, because the child was born before the marriage of its parents, it does not result that the child was illegitimate in fact, and the court, as we have noted, found otherwise. Regardless of birth out of wedlock, section 215 of the Civil Code was enacted for the benefit of the child, that it may not be burdened with the sins of its parents. (*Estate of Wardell*, 57 Cal. 484.)

■ Another point advanced is the contention that jurisdiction of the minor was acquired by the court in which the divorce proceeding was pending. An order restraining the father from molesting his wife and child was obtained, but the divorce case had not been set for trial or even assigned to any particular department. It does not appear that any exception was voiced as to the power of the court to hear and determine this matter when it was called. Appellant's counsel requested that the court familiarize itself with the pleadings, and proceed with the trial as though properly set therein. In any event, the different departments hold but one and the same court (*Nickel* v. *State,* 179 Cal. 126 [175 Pac. 641]; *Brown* v. *Campbell,* 110 Cal. 644 [43 Pac. 12]), and if one department exercises authority in a matter which might more properly be heard in another, its action constitutes at most an irregularity, and does not affect the jurisdiction. (*Graziani* v. *Denny,* 174 Cal. 176 [162 Pac. 397]; *Carter* v. *Lothian,* 133 Cal. 451 [65 Pac. 692].)

It is argued that this minor had no "estate" within the statutory definition, and that even though a guardian of the person might be appointed, such action is not justified as to the estate of the ward. We are cited to no authority holding that it is error to appoint a guardian of the person of a ward also guardian of the estate, although no substantial estate may exist. No possible prejudice can result from such action. The guardian under such circumstances can have no jurisdiction over such property as belongs to the parents. On the other hand, as guardian of the person, certain funds and personal property must come into the hands of the guardian, at least such as are necessary for the proper support and education of the minor. This, of course, the parents may be required to supply. We conclude as to this point that appellant is not prejudiced by the court's order appointing a guardian of the estate as well as of the person.

From what has been said it becomes unnecessary to consider incidental questions presented which are of necessity embraced therein.

The judgment and orders appealed from are affirmed.

Works, P. J., and Thompson (Ira F.), J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on November 6, 1929, and a petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on December 5, 1929.